UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          :
                                  :
                                  :
                                  :    Case no. 2:10-cr-126
          v.                      :
                                  :
KAREEM CAMPBELL,                  :
                                  :
               Defendant.         :

**OPINION and ORDER**

Kareem Campbell has been charged in a three-count indictment with possessing with intent to distribute oxycodone, possessing cocaine, and disobeying a lawful order of the United States District Court for the Eastern District of New York, which had sentenced him to a term of supervised release prohibiting him from possessing controlled substances.  On December 20, 2010, Campbell filed a motion to suppress evidence, a motion to dismiss Count Three of the indictment for lack of jurisdiction, and a motion to sever Counts One and Two.  ECF No. 13.  The Government has agreed to dismiss Count Three without prejudice.  Resp. in Opp'n to Mot. to Suppress 5-6, ECF No. 16.  Accordingly, the motion to dismiss is **denied as moot.**  For the reasons set forth below, the motion to suppress is **granted** and the motion to sever is **denied as moot.**

**Summary of the Evidence**

Affidavit and Testimony of Officer O'Connor

At a hearing held on March 2, 2011, South Burlington Police

Officer Jack O'Connor provided the following account of the arrest of Kareem Campbell, which was consistent with a probable cause affidavit he completed the day after the arrest. *See* Suppression Hr'g Tr., March 2, 2011, ECF No. 24-1; Probable Cause Aff., ECF No. 13-2.

On March 22, 2010, O'Connor was performing "general patrol" in South Burlington. Suppression Hr'g Tr. 14. He was in uniform and in a marked police cruiser. *Id*. At approximately 8:30 PM, O'Connor drove into the parking lot of a Hannaford supermarket on Dorset Street, where he planned on purchasing something to drink. *Id*. The supermarket has two entrances, one of which was closed. *Id*. at 14-15. Near the closed entrance, O'Connor observed a Lincoln Navigator parked "kind of off by itself." *Id*. at 15. He suspected that the Navigator was a rental car because it was "very clean" and had New York license plates. *Id*. He observed that there were several air fresheners hanging from the rear-view mirror. *Id*. The air fresheners, along with the fact that the vehicle appeared to have been rented in New York, which O'Connor believes is the "main source area for narcotics coming to Burlington," aroused his suspicion that the car was being used in connection with a drug offense. *Id*. at 16-18. Before entering the supermarket to purchase water, O'Connor radioed the dispatcher to run the license plate number. *Id*. at 16. The record check indicated that the vehicle was in fact a rental.

*Id.*

Upon exiting the supermarket, O'Connor observed that the vehicle appeared to be unoccupied. *Id.* He drove around the University Mall, which is in the same complex as the supermarket, and, when he returned to the supermarket parking lot, observed a black male, later identified as Kenneth Walker, walking away from the Navigator and toward the supermarket. *Id.* at 18. The lights of the Navigator were on for a moment and then turned off, as though the vehicle had just been locked. *Id.* at 18-19. As O'Connor drove toward him, Walker changed direction and began walking back toward the Navigator.[1] *Id.* at 19-20. O'Connor, who had his window rolled down, complimented the Navigator and asked Walker what year it was. *Id.* at 20. Walker responded that it was a 2010 and O'Connor asked him his name. *Id.* Walker began looking left and right and repeated the question back, behaviors that suggested to O'Connor that he was nervous and "fabricating a story." *Id.* Walker then told O'Connor that his name was "Mark Dennis Smith." *Id.* at 21. O'Connor observed that Walker "looked like he was stoned" because "[h]is eyes were red and watery." *Id.* O'Connor could see this because the parking lot was

---

[1] There is some suggestion in the Government's briefing that Walker "was trying to avoid any contact with law enforcement" when O'Connor drove toward him. Resp. in Opp'n to Mot. to Suppress 6. In fact, O'Connor testified, and a video recording confirms, that when Walker walked back in the direction of the Navigator he was also walking toward O'Connor's vehicle. *See* Suppression Hr'g Tr. at 59-60.

"illuminated by overhead lights."  *Id.*

O'Connor radioed his dispatcher to perform a record check on the name "Mark Dennis Smith" using a date of birth Walker provided.  *Id.*  When the dispatcher was unable to find a record in the Vermont database using this information, O'Connor asked Walker further questions.  *Id.* at 21-22.  Walker indicated that he was from New York and that he had previously been arrested for possession of marijuana in New York City.  *Id.* at 22.  O'Connor then had the dispatcher run the name in the New York DMV database and in a nationwide criminal records database, which also did not yield any results.  *Id.*  Based on Walker's behavior and the fact that he appeared to be lying about his identity, O'Connor suspected that "he was either armed or wanted or both."  *Id.* O'Connor therefore called for backup.  *Id.*

It took the backup officers approximately five minutes to arrive.  *Id.* at 23.  Before the backup officers arrived, Walker used his cell phone to call someone to come pick him up.  *Id.* at 23-24.  Shortly thereafter, a car arrived occupied by Natasha Brissette and Amy Romero.  *Id.* at 24.  O'Connor recognized Romero from a previous encounter in which he had responded to a hotel room that contained "a lot of crack cocaine paraphernalia, packaging material, some swords and a gun."  *Id.*  He had also previously arrested Brissette for retail theft and believed that her mother, Shelly Trombley, had dated men from New York City who

4

were involved in drug trafficking.  *Id*. at 25-26.[2]  O'Connor
asked the two women to identify Walker, but they said they only
knew his nickname.  *Id*.

Once the backup officers arrived, O'Connor asked them to
stand with Walker, Brissette and Romero, "so [he] could go back
and look at the Navigator."  *Id*. at 27.  Using his flashlight,
O'Connor "looked in the driver's side window and [] saw a
marijuana grinder[3] and green, leafy material all over the center
console, on the gear shifter."  *Id*. at 28.  Because the material
was "pretty bright green," he believed it was marijuana residue,
and not another substance such as tobacco, which is "dark brown."
*Id*. at 28-29.  O'Connor then walked around the vehicle and peered
into the other windows with his flashlight.  *Id*. at 29-30.  When

---

[2] O'Connor testified that he had seen two men with Ms.
Trombley earlier that weekend in the vicinity of the same
shopping complex.  "[I]n hindsight, [he] believe[d] [them] to be
the two defendants in this case."  Suppression Hr'g Tr. at 26-27.
He recalled that the men he had seen with Ms. Trombley had been
dressed in "pretty blazing red and black," the colors of the
"Bloods" street gang.  *Id*.; Probable Cause Aff. ¶ 11.  He could
not say with certainty at what point he realized that Walker and
Campbell were the men he had seen earlier in the weekend, but
believes that "it was a factor in [his] mind when [he] saw []
Brissette . . . at Hannaford's again."  Suppression Hr'g Tr. at
27.  Video evidence introduced during the hearing shows that
Walker was wearing a green shirt and Campbell a black shirt
during the incident is the subject of this motion.

[3] O'Connor testified that a marijuana grinder is a small
cylindrical object used to grind marijuana buds into a finer
material for smoking.  Suppression Hr'g Tr. at 28-29.  While such
grinders are ostensibly sold to prepare tobacco for smoking,
O'Connor indicated that when he has encountered such grinders in
the past, they were being used for marijuana.  *Id*.

he reached the rear "hatchback trunk area," he initially "didn't see anything as it[] [has] dark windows." *Id*. at 30. "[T]hen a person [] later identified as [Kareem] Campbell opened his eyes, and [O'Connor] saw [that Campbell] was hiding in the back of the trunk . . . kind of in a fetal position." *Id*. O'Connor then opened the door of the vehicle, shone his flashlight inside and ordered Campell to exit. *Id*. At the same time as he was opening the door O'Connor drew his gun and pointed it at Campbell. *Id*. at 31-32. When asked why he drew his gun, O'Connor testified "[b]ecause I believed he was hiding, and I believed these two were involved in drug trafficking. And there was drugs in plain view." *Id*. As Campbell exited the vehicle, he reached behind his back "at least three times." *Id*. O'Connor "kept yelling, 'Show me your hands.'" *Id*.

About five minutes after Campbell was removed from the Navigator, another officer arrived on the scene with a drug-

As soon as Campbell was out of the vehicle, O'Connor handcuffed him "[t]o get control of him [because] my verbal commands weren't controlling him." *Id*. at 32-33. O'Connor patted Campbell down, removed a cell phone and cash from his pocket, and asked him his name. *Id*. at 33, 54-55. Campbell gave the name "Cecil Campbell." *Id*. at 33. O'Connor testified that, at the time he ordered Campbell out of the car he believed he had probable cause to arrest him. *Id*. at 35.

About five minutes after Campbell was removed from the Navigator, another officer arrived on the scene with a drug-

detecting dog. *Id.* at 35. The dog detected the odor of
narcotics emanating from both the Navigator and the vehicle in
which Brissette and Romero had arrived. *Id.* at 36. When
O'Connor informed Campbell that the dog had smelled narcotics,
Campbell admitted that he smokes marijuana. *Id.*

From the parking lot, O'Connor radioed the dispatcher to
call the rental company to which the Navigator was registered.
*Id.* at 36-37. The rental company indicated that the car had been
rented by Melinda Bailey and that there were no other drivers
listed on the rental agreement. *Id.* The rental company
requested that, if Ms. Bailey was not present, the vehicle be
seized. *Id.*

"At that point [O'Connor] believed [he] had probable cause
to search both gentlemen and the vehicle[.]" *Id.* at 37. He
therefore had both Walker and Campbell, as well as the Navigator,
transported from the supermarket parking lot to the South
Burlington Police Department, where he planned on applying for
search warrants for both men and the vehicle. *Id.*; Probable
Cause Aff. ¶ 24 ("The two men were transported back to SBPD []
station for identification, a search warrant and the marijuana in
plain view.").

At the police station, Campbell was placed in an interview
room monitored by a closed circuit video camera. Suppression
Hr'g Tr. at 79-81; Probable Cause Aff. ¶ 25. While Campbell was

alone in the room, another officer, who was watching the video feed, observed him remove an object from the rear of his pants and place it in a hole in the wall. *Id.* Officers then entered the room and recovered from the wall two bags containing approximately 130 oxycodone pills. Probable Cause Aff. ¶ 26. O'Connor searched Campbell and found two MDMA pills in a plastic wrapper in his long underwear. *Id.* at ¶ 26. O'Connor believed that Campbell had additional drugs secreted in his buttocks because he "was clinching his buttocks closed and . . . continued to attempt to reach down the back of his pants." *Id.* at ¶ 26. To prevent Campbell from continuing to reach into his pants, O'Connor placed duct tape around the top of his pants. Suppression. Hr'g Tr. at 89, 105-06. Once Campbell was transferred to the Chittenden Regional Correctional Facility for detention, O'Connor requested that he be placed in a "dry cell," so that his bowel movements could be monitored. Suppression Hr'g Tr. at 86-87.

O'Connor testified that he never read Campbell his *Miranda* rights during this incident. *Id.* at 109, 110. His testimony indicates that Campbell remained handcuffed from the time he was ordered out of the Navigator through the period he spent in the interview room at the South Burlington Police Department. *See id.* at 83. There was no testimony as to when Campbell's handcuffs were removed.

8

On cross examination, O'Connor testified that, to the best of his recollection, his testimony as well as his probable cause affidavit documented his observations and the events surrounding Campbell's arrest in chronological order.  *Id*. at 40-46.

Transcript of Interview with Detective Sergeant Burnham

Detective Sergeant Lance Burnham of the Vermont State Police interviewed Campbell at the Chittenden Regional Correctional Facility on March 26, 2010, after a bag of cocaine was discovered in Campbell's stool during the monitored bowel movement.  The Government introduced an audio recording and a transcript of the interview into evidence at the hearing.  At the start of the interview, Burnham indicated to Campbell that he was not under arrest for the cocaine charge, that the door to the interview room was unlocked and that he was free to leave the room at any time.  Burnham did not give Campbell a *Miranda* warning.  During the interview Burnham asked Campbell about the cocaine and oxycodone and probed Campbell's willingness to become a cooperator.

Video and Photographic Evidence

At the hearing, defense counsel introduced into evidence a series of video recordings taken by cameras in the police vehicles at the scene of the arrest and by a camera in the interview room at the South Burlington Police Department.  The parties also introduced several photographs of the Navigator,

9

which O'Connor testified "reflect[ed] the condition of the
vehicle when [he] initially came upon it and shined [his]
flashlight in it."  Suppression Hr'g Tr. at 38.

    The video and photographic evidence undermines the
credibility of O'Connor's account of the incident in several
significant respects.  Supplemental Br. in Supp. of Mot. to
Suppress, ECF No. 24.  Most importantly, the video recordings
from the scene of the arrest suggest that "O'Connor front-loaded
his affidavit and direct-examination testimony with suspicious
observations making it appear that there was more suspicion by
the time he ordered Mr. Campbell out of the Navigator than there
actually was."  *Id.* at 6.  The video from South Burlington
cruiser number 4 shows that Campbell was ordered out of the
Navigator at approximately 8:50 PM.  According to O'Connor's
testimony and affidavit, at the time he ordered Campbell out of
the vehicle at gunpoint, he believed that he had probable cause
to arrest him based, in large part, upon his observation of
marijuana and the grinder in plain view on the center console.
*See* Suppression Hr'g Tr. at 28-29; Probable Cause Aff. ¶ 13.
However, on the video from cruiser 5, O'Connor can be heard
saying to another officer at 9:04 PM: "Uhh, it looks like . . .
[pause]  What's that thing in the center console?  Is that a . .

. a grin . . . that's a grinder isn't it?"[4]  The tone of voice

and pauses suggest that this is the moment when he first noticed

the grinder.

O'Connor's testimony that he observed marijuana residue in

plain view before ordering Campbell out of the Navigator was also

undermined by the photographs taken of the vehicle at the police

station.  While O'Connor testified that he was able to identify

the marijuana residue through the closed window because it was

"pretty bright green," *id*. at 28-29, the photos, taken with a

flash in a well-lit garage, depict brown smudges on the center

console, gear shifter and steering wheel.[5]

---

[4] The microphone O'Connor was wearing did not begin
recording audio for the incident until twenty-two minutes after
his initial encounter with Walker.  This means there is no audio
recording of what happened before Campbell was ordered out of the
Navigator.  O'Connor attributed this to a technical malfunction.
Suppression Hr'g Tr. at 101.  At the hearing, Campbell introduced
into evidence a decision of the Vermont District Court for
Chittenden County, granting a motion to suppress in the case of
*State of Vermont v. Bove*, No. 6224-12-05 Cncr, slip op. (Vt.
Dist. Ct. 2006).  The opinion noted that in that case, also
investigated by O'Connor, "for reasons [] not [] satisfactorily
explained, the audio recording of the [encounter between O'Connor
and the defendants] failed at precisely the moment that it became
critical." *Id*. at 4.

Similarly, in *Diamond v. O'Connor*, a civil case tried before
this Court in which O'Connor was found to have violated Diamond's
Fourth Amendment rights by seizing his property without probable
cause, *see* 347 Fed. Appx. 676 (2d Cir. 2009), there was evidence
that police audio recording equipment malfunctioned during a
critical portion of the interaction between O'Connor and the
plaintiff.  *See* Trial Tr. vol. 7, 184, August 1, 2008, *Diamond v.
O'Connor*, No. 05-CV-279 (D. Vt. 2008).

[5] Notably, although O'Connor testified that he believed that
the marijuana he observed on the console was "probably" tagged as

11

O'Connor also indicated in both his affidavit and his
direct-examination testimony that, before Campbell was removed
from the Navigator, his suspicion had been aroused by the fact
that he had been unable to identify Walker based on the name,
date of birth and account of a prior arrest for possession of
marijuana he had provided.  Suppression Hr'g Tr. at 21-22;
Probable Cause Aff. ¶ 7.  On the video recording from cruiser 5,
O'Connor can be heard saying "we have to identify this guy" at
9:08 PM and then asking Walker if he's "ever been arrested
before[.]"  When Walker indicates that he was arrested for a
marijuana-related offense in New York, O'Connor responds "Okay,
great, that will help identify you."  O'Connor can next be heard
radioing the dispatcher with a request to perform a "triple-I"
records check.  Shortly thereafter, the dispatcher radios back
that the search has revealed "no identifiable record[.]"  On re-
direct examination, O'Connor clarified that a triple-I records
check is a nation-wide criminal history check and that he
believed that he performed this check shortly after checking the
Vermont and New York databases, before he was aware of Campbell's
presence in the Navigator.  Suppression Hr'g Tr. at 103-05.  He
conceded that his memory of when he ran the triple-I check

---

evidence, the Government did not introduce any evidence
documenting this.  Defense counsel has also represented that the
Government has not provided, as part of its discovery
disclosures, any evidence that the residue was ever field tested.
Supplemental  Br. in Supp. of Mot. to Suppress 14 n.13.

conflicted with what the tape actually shows: that it was not performed until after Campbell had been ordered out of the vehicle.  *Id*.  While it is possible that O'Connor ran the Vermont and New York checks before Campbell was removed from the car, there is no evidence of this other than his own testimony, the reliability of which is questionable.

O'Connor's statements that he was suspicious of the Navigator because it was parked "alone and away from other cars," Probable Cause Aff. ¶ 1; *see also* Suppression Hr'g Tr. at 15, was also undermined by the video evidence.  The video from cruiser 4 shows that the Navigator was parked in front of a well-lit entrance to the supermarket[6] and that another vehicle was parked nearby.  The owner of this other vehicle can be seen walking from the supermarket to his car, with what appear to be grocery bags in hand, and then driving away shortly after Campbell was ordered out of the Navigator.

Finally, video from the interview room at the South Burlington Police Department suggests that there is reason to question O'Connor's professionalism.  While the video feed was not being recorded at the time that Campbell is alleged to have

---

[6] O'Connor testified that this entrance was closed at the time of the incident.  Suppression Hr'g Tr. at 15.  However, the video from cruiser 5 shows that the entrance was well enough lit that another customer walked toward it before realizing that it was closed and walking toward the other entrance.  Suppression Hr'g Tr. at 126.

hidden the oxycodone pills in the wall,[7] a recording of what
happened afterward shows O'Connor pulling Campbell's pants down
to search his buttocks area and then taunting Campell.  When
Campbell, after having his pants pulled back up, objects to the
top of his pants being duct taped, O'Connor responds, "You have
the right to be duct taped," and then laughs at Campbell.  The
tape also shows that O'Connor, who testified that he did not read
Campbell his *Miranda* rights, asked Campbell questions about the
contraband recovered in the interview room.

On cross-examination, defense counsel attempted to impeach
O'Connor by suggesting that his behavior in the interview room
showed that his interactions Campbell were somehow "personal."
*Id*. at 88-91.  Although it is difficult to assess O'Connor's
particular motives, it is clear that, at the very least, his
behavior was less than professional, which calls into question
his judgments during the incident and the accuracy of his
testimony.[8]

_____

[7] O'Connor testified that the officer monitoring the closed
circuit video feed was responsible for recording the feed on a
DVD.  Suppression Hr'g Tr. at 80-81.  This officer told O'Connor
that he had not yet inserted a DVD into the recording system at
the time Campbell hid the pills in the wall.  *Id*.

[8] Campbell has brought to the Court's attention evidence
suggesting that O'Connor's lack of professionalism became a
matter of concern for the Chittenden County State's Attorney's
Office.  For example, appended to Campbell's reply brief is a
2005 letter from former State's Attorney Robert Simpson that was
admitted into evidence at the *Diamond v. O'Connor* trial.  Reply
to Gov't Resp. in Opp'n, ECF No. 17-8.  In the letter, Simpson

### Discussion

The threshold question in evaluating Campbell's motion to suppress on Fourth Amendment grounds is at what point during the incident was he placed under arrest.  While reasonable suspicion of criminal activity may justify a brief investigative detention, *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), an arrest violates the Fourth Amendment if it is not supported by probable cause.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Campbell argues that, for Fourth Amendment purposes, he was under arrest as soon O'Connor ordered him out of the Navigator at gunpoint and that this arrest was not supported by probable cause.  The Government, without conceding that O'Connor lacked probable cause at the time he ordered Campbell out of the vehicle, suggests that this action constituted an investigative detention and not an arrest.  Resp. in Opp'n to Mot. to Suppress 7.[9]

While it is clear that Campbell was seized from the time he

---

stated that based upon a pattern of complaints lodged against O'Connor, he was "very concerned that [O'Connor] [was] developing the attitude that the rules we are all obliged to follow are often just silly impediments to his concept of justice."  *Id*.  At the suppression hearing in the instant case, O'Connor confirmed that his relationship with the State's Attorney's office had been tumultuous.  Suppression Hr'g Tr.  at 93-96.  He testified that certain prosecutors at that office had refused to prosecute his cases and that he had sued State's Attorney T.J. Donovan, who succeeded Simpson, because he believed Donovan had a "personal vendetta" against him.  *Id*.

[9] The Government does not identify the exact point at which it believes Campbell was under arrest for Fourth Amendment purposes.

was ordered out of the vehicle at gunpoint,[10] the question is
whether this seizure was the equivalent of a full-fledged arrest
or the type of limited investigative detention authorized by
*Terry*.  "In determining whether a particular restraint is an
arrest or tantamount to an arrest, thus requiring probable cause,
or instead is a restraint short of an arrest, thus calling for
analysis under a reasonableness standard, the degree of restraint
must be analyzed."  *United States v. Marin*, 669 F.2d 73, 81 (2d
Cir. 1982).  "In particular, courts have considered the amount of
force used by the police, the extent of the intrusion, and the
extent to which the individual's freedom of movement is
restrained."  *Id*.  In *United States v. Ceballos*, the Second
Circuit concluded that the defendant, who was observed exiting a
suspected drug location with a bag in his hand, "was arrested
when police officers blocked the progress of his car and
approached with guns drawn, and that such arrest [required]

---

[10] "[A] person has been 'seized' within the meaning of the
Fourth Amendment only if, in view of all of the circumstances
surrounding the incident, a reasonable person would have believed
that he was not free to leave."  *United States v. Mendenhall*, 446
U.S. 544, 554 (1980).  "Examples of circumstances that might
indicate a seizure . . . would be the threatening presence of
several officers, the display of a weapon by an officer, some
physical touching of the person of the citizen, or the use of
language or tone of voice indicating that compliance with the
officer's request might be compelled."  In the instant case, it
is clear that Campbell was seized when O'Connor ordered him out
of the Navigator at gun point, immediately placed him in
handcuffs and frisked him.  Under these circumstances a
reasonable person certainly would not have believed that he was
free to leave.

probable cause."  654 F.2d 177, 181 (2d Cir. 1981) (citing, *inter alia, United States v. Vasquez,* 638 F.2d 507, 522 (2d Cir. 1980) (arrest occurred when "officers leveled their guns at the [defendants] and ordered them out of their car."); *United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975) (arrest occurred when "agents, at gunpoint, under circumstances not suggesting fears for their personal safety, ordered the appellant and his passenger to stop and put their hands up."); *United States v. Strickler*, 490 F.2d 378, 379-80 (9th Cir. 1974) (arrest occurred when three police cars surrounded defendant's parked car and one officer, with gun drawn, approached defendant and ordered him to raise his hands); *United States ex Rel. Walls v. Mancusi*, 406 F.2d 505, 508-09 (2d Cir. 1969) (arrest occurred when officer ordered suspect out of truck at gunpoint.)).  The *Ceballos* court indicated that, although specific behaviors by a suspect suggesting dangerousness might make it reasonable for officers to draw their guns and order a suspect out of a car in the context of a *Terry* stop, such tactics transformed the encounter into an arrest where "the officers articulated no facts which they viewed as creating a need for the use of force and a degree of intrusion beyond that generally employed in *Terry* stops."  *Id.* at 183-84; *see also Massillon v. Conway,* 574 F. Supp. 2d 381, 397 (S.D.N.Y. 2006) (detention amounts to *de facto* arrest where reasonable person would not believe he was free to leave and measures used

by the police were clearly more forceful and intrusive than
necessary to perform investigative stop).

In the instant case, O'Connor failed to articulate a
plausible basis for believing that Campbell was dangerous at the
time he drew his gun and ordered him out of the Navigator.  *Id*.
at 31-32.  When asked why he drew his gun while opening the door
to the vehicle, O'Connor testified "[b]ecause I believed
[Campbell] was hiding, and I believed these two were involved in
drug trafficking.  And there was drugs in plain view."
Suppression Hr'g Tr. at 31-32.  As discussed further *infra*,
O'Connor's testimony that he had specific, articulable grounds to
suspect that Walker and Campbell were engaged in drug crimes
prior to ordering Campbell out of the vehicle was not credible.[11]
Furthermore, Campbell's presence in the trunk area of the vehicle
with his eyes closed -- which O'Connor interpreted as an effort
to evade detection -- was not, in and of itself, indicative of

---

[11] Even if O'Connor did have reasonable suspicion that the
pair was involved in drug trafficking at this time, this alone
would not have been sufficient grounds for drawing his weapon
while ordering Campbell out of the car.  *See Ceballos*, 654 F.2d
177 at 184 ("Although we agree . . . that narcotics traffickers
are often armed and violent, . . . that generalization, without
more, is insufficient to justify the extensive intrusion which
occurred in this case.  If it were, any narcotics suspect, even
if unknown to the agents and giving no indication that force is
necessary, could be faced with a 'maximal intrusion' based on
mere reasonable suspicion. The Fourth Amendment requires more to
justify a 'maximal intrusion.' Similarly, the seriousness of the
suspected offense cannot, without more, provide the basis for an
intrusive Terry stop or for an arrest." (internal citations and
quotations omitted)).

dangerousness.  And although O'Connor testified that Campbell repeatedly reached behind his back while exiting the vehicle, the testimony was clear that this did not occur until after O'Connor had drawn his gun and given Campbell the verbal command to exit. Accordingly, O'Connor cannot use this subsequent behavior to justify his decision to draw his gun.  Because O'Connor did not have legitimate reason to believe Campbell was dangerous at the time he drew his gun and ordered him out of the vehicle, the Court finds that, for purposes of Fourth Amendment analysis, Campbell was under arrest at that point in the encounter. *Ceballos*, 654 F.2d at 183-84; *cf. United States v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977) (drawing of guns did not transform stop into arrest in view of officers' information that the two men were armed and fleeing an attempted bank robbery in which shots were fired).[12]

The Government argues that even if Campbell was under arrest when he was ordered out of the Navigator at gunpoint, O'Connor had probable cause to make the arrest at this point in the encounter.  Probable cause exists where, "at the moment the arrest was made, . . . the facts and circumstances within the[] [officers'] knowledge and of which they had reasonably

---

[12] That Campbell was handcuffed immediately after exiting the Navigator and remained so throughout his time in the interview room at the police station further supports the conclusion that he was under arrest from the time he was ordered out of the vehicle.

trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck*, 379 U.S. at 91 (citation omitted).  On a motion to suppress, "the Government bears the burden of proof as to establishing probable cause." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008).

O'Connor testified that he believed he had probable cause when he ordered Campbell out of the Navigator based on the following facts and circumstances: 1) the marijuana residue and grinder in plain view on the center console of the vehicle; 2) Campbell's apparent attempt to hide in the trunk area; 3) the location of the Navigator, a rental vehicle from New York with multiple air fresheners, in a remote area of the parking lot; and 4) Walker's nervous behavior, apparent intoxication, and evasiveness in identifying himself.  He also indicated that his prior interactions with Brissette and Romero, the two women who Walker called to pick him up from the supermarket parking lot, aroused his suspicion.

As explained *supra*, the video and photographic evidence contradicts O'Connor's testimony that the Navigator was parked in a remote area of the parking lot and that, before he ordered Campbell out of the vehicle at gunpoint, he observed the marijuana and grinder.  This evidence also shows that O'Connor did not run a triple-I check based upon Walker's report of a

20

prior marijuana-related arrest until after Campbell was outside
of the vehicle, although it is unclear at what point he ran the
fake name and date of birth that Walker provided in the Vermont
and New York databases.  Even if one credits O'Connor's testimony
that he suspected Walker was answering questions about his
identity falsely, that he had some association with two women who
may have been involved in criminal activity in the past, and that
his eyes were red and watery,[13] these facts, even when taken
together with the observation that Campbell was in the trunk area
of a rental vehicle with New York plates and multiple air
fresheners, were insufficient to create probable cause to arrest
Campbell.[14]  That is, the facts known to O'Connor at the time
Campbell was ordered out of the vehicle at gunpoint "were [not]
sufficient to warrant a prudent man in believing that [Campbell]
had committed or was committing an offense."  *Beck*, 379 U.S. at
91 (citation omitted); *see Illinois v. Gates*, 462 U.S. 213, 230
(1983) (questions of probable cause should be decided using a

---

[13] In light of questions relating to O'Connor's credibility
on key factual issues in this case, the Court is hard-pressed to
credit his testimony regarding his subjective observations that
Walker appeared nervous and "stoned."

[14] Taking into account the absence of any substantiated
evidence of drug activity at the time O'Connor first observed
Campbell in the Navigator, the Court finds that O'Connor also
lacked the reasonable suspicion necessary to justify a *Terry* stop
of Campbell at this point.

21

"totality-of-the-circumstances approach").[15]

Because Campbell was arrested without probable cause, the motion to suppress on Fourth Amendment grounds is **granted.**  All evidence obtained as a result of the arrest, including the contraband recovered and the statements taken from Campbell at South Burlington Police Department and at the Chittenden Regional Correctional Facility, must be suppressed.  *See Delossantos,* 536 F.3d at 158 (citing *Wong Sun v. United States,* 371 U.S. 471, 485-86 (1963) (post-arrest statements and evidence obtained during post-arrest search "must be suppressed as the fruit of an unlawful arrest").[16]  Because this evidence must be suppressed as fruit of the unlawful arrest, the Court need not address Campbell's arguments that the monitored bowel movement at the Chittenden Regional Correctional Facility constituted an unlawful

_____

[15] It should be noted that, in his post-hearing briefing, Campbell argues that O'Connor may have first approached Walker, an African-American man, based upon racial profiling. Supplemental Br. in Supp. of Mot. to Suppress 15-16.  At the hearing, Campbell introduced statistical evidence suggesting that O'Connor has arrested African Americans at a disproportionately high rate.  *See* Suppression Hr'g Tr. at 134-39.  The Government argues that, in any event, Campbell "does not have standing to assert the constitutional rights of his companion."  Supplemental Resp. in Opp'n to Mot. to Suppress 2, ECF No. 25.  Regardless of whether O'Connor engaged in racial profiling of Walker, his arrest of Campbell was not supported by probable cause. Accordingly, the Court does not reach these arguments.

[16] The Government has not raised any arguments that the physical evidence and statements obtained from Campbell were sufficiently attenuated from the taint of the unlawful arrest to warrant their admission.  *See Wong Sun,* 371 U.S. at 487-88.

22

search or that his statements to Detective Sergeant Burnham were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Because the evidence of Campbell's possession of cocaine and oxycodone must be suppressed, the motion to sever the cocaine count from the oxycodone count is **denied as moot.**


     Dated at Burlington, in the District of Vermont, this 17th day of May, 2011.

                                   /s/ William K. Sessions III
                                   William K. Sessions III
                                   U.S. District Court Judge